# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**AIMEE FISCHER**
        **Plaintiff,**

    **v.**                            **Case No. 19-C-291**

**ANDREW M. SAUL,**
**Commissioner of the Social Security Administration**
        **Defendant.**

## DECISION AND ORDER

Plaintiff Aimee Fischer applied for social security disability benefits, alleging that she could no longer work due to a variety of impairments, including fibromyalgia, hip and back pain, obesity, depression, and anxiety, but the Administrative Law Judge ("ALJ") assigned to the case concluded that she could still perform a range of unskilled, sedentary work. Plaintiff now seeks judicial review of the denial. On review of the record and the submissions, I find no reversible error and thus affirm the ALJ's decision.

## I. STANDARDS OF REVIEW

### A.    Disability Standard

Social security regulations prescribe a five-step process for determining whether a claimant is disabled. 20 C.F.R. § 404.1520(a)(4). Under this test, the ALJ asks:

(1) Is the claimant working, i.e., engaging in "substantial gainful activity"?

(2) If not, does the claimant have a "severe" impairment or combination of impairments?

(3) If so, do any of the claimant's impairments qualify as presumptively disabling under the agency's regulations, i.e., the "Listings"?

(4)  If not, does the claimant have the residual functional capacity ("RFC") to perform her past relevant work?

(5)  If not, is the claimant able to perform any other work in the national economy in light of her RFC, age, education, and work experience?

The claimant bears the burden of proof at steps one through four, after which at step five the burden shifts to the Commissioner.  Briscoe v. Barnhart, 425 F.3d 345, 352 (7th Cir. 2005).  "The Commissioner typically uses a vocational expert ('VE') to assess whether there are a significant number of jobs in the national economy that the claimant can do."  Liskowitz v. Astrue, 559 F.3d 736, 743 (7th Cir. 2009).

Where, as here, the claimant applies for disability insurance benefits, she must further establish that she became disabled while in "insured status."  See, e.g., Stevenson v. Chater, 105 F.3d 1151, 1154 (7th Cir. 1997).  In other words, if the claimant cannot establish disability prior to her "date last insured" she cannot obtain benefits even if she is disabled currently.  See Shideler v. Astrue, 688 F.3d 306, 311 (7th Cir. 2012).

## B.    Judicial Review

The court "will affirm a decision on disability benefits if the ALJ applied the correct legal standards in conformity with the agency's rulings and regulations and the conclusion is supported by substantial evidence."  Prater v. Saul, 947 F.3d 479, 481 (7th Cir. 2020).  "Substantial evidence" means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019).  The court will not, under this deferential standard, re-weigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for that of the ALJ.  L.D.R. v. Berryhill, 920 F.3d 1146, 1151-52 (7th Cir. 2019).  Where substantial evidence supports the ALJ's disability

determination, the court must affirm the decision even if reasonable minds could differ concerning whether the claimant is disabled. Id. at 1152.

In rendering a decision, the ALJ is required to build a logical bridge from the evidence to his conclusion, but he need not provide a complete written evaluation of every piece of testimony and evidence, Pepper v. Colvin, 712 F.3d 351, 362 (7th Cir. 2013), and must only "minimally articulate" his justification for rejecting specific evidence of disability, Berger v. Astrue, 516 F.3d 539, 545 (7th Cir. 2008). In reviewing an ALJ's decision for fatal gaps or contradictions, the court reads the decision as a whole and with common sense rather than nitpicking at it. Castile v. Astrue, 617 F.3d 923, 929 (7th Cir. 2010).

## II. FACTS AND BACKGROUND

### A.     Plaintiff's Application and Agency Decisions

Plaintiff applied for benefits in September 2015, alleging that she became disabled as of January 15, 2014 (Tr. at 157) due to diabetes, fibromyalgia, back pain, muscle spasms, chest pain, anxiety, depression, lumbar arthritis, cervical degenerative disc disease, and right hip surgery (Tr. at 185). The agency's records indicated that she was 27 years old as of the alleged onset date, and that she remained in insured status through December 31, 2015. (Tr. at 68.)

In a function report, plaintiff alleged that she could not stand for more than 30 minutes, sit for more than 45 minutes, and lift more than 15 pounds. Anxiety caused her to be very emotional, uncomfortable in new places and around new people, and become sick to her stomach. (Tr. at 206.) She wrote that on an average day she would get up, do some stretches, eat breakfast, sit on the couch and watch TV, try to get some light housework done, eat lunch,

rest on the couch, talk with her husband when he got home from work, eat dinner he made, and watch TV. (Tr. at 207.) She reported hobbies of reading, watching TV, and going to baseball games; she watched TV and read daily and went to baseball games once or twice per month but could not stay for a whole game anymore. She also reported problems getting along with others, fearing that they were judging her. (Tr. at 210.) She alleged that her illnesses affected her abilities to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, remember, and get along with others. She indicated that she could walk 1/4 mile before she had to rest for five minutes, but could pay attention as long as needed and followed written and spoken instructions pretty well. (Tr. at 211.) She also got along fine with authority figures and handled changes in routine fine, but did not handle stress well. (Tr. at 212.) In a physical activities addendum, plaintiff reported that she could continuously sit for one hour, stand for 30 minutes, and walk 1/4 mile; in a day, she could sit for nine hours (with frequent re-adjustments) and stand or walk "very few" hours. (Tr. at 214.)

The agency denied the application initially in December 2015 (Tr. at 94-97) based on the record review of Pat Chan, M.D., who concluded that plaintiff could perform light work (Tr. at 77), and Kyla King, Psy.D., who concluded that plaintiff's mental impairments caused no more than mild difficulties (Tr. at 75-76.) The reviewers considered plaintiff's allegations of pain related to fibromyalgia, back, neck, and hip problems, noting that while plaintiff was found to have fibromyalgia based on trigger point testing, MRI scans of her cervical and lumbar spines revealed only mild findings; physical exams revealed intact balance and gait, normal strength and sensation in the bilateral upper and lower extremities, and good recovery from a November 2015 arthroscopic procedure on her right hip; and plaintiff told providers that pain did not require her to change the way she dressed and bathed, that she was able to look after

4

herself without causing extra pain, that she could concentrate fully when she wanted to with no difficulty and drive as long as she wanted with slight neck pain, that she had no trouble sleeping, that she was able to engage in most (but not all) recreational activities, that pain limited her ability stand and walk but she could sit in her favorite chair as long as she wanted, and that her pain seemed to be getting better. Mentally, while she had been treated for depression and anxiety, exams revealed normal speech, full affect, appropriate mood, and good insight/judgment. While plaintiff had reported difficulties with memory and getting along with others, the records revealed that she was cooperative and her memory intact. (Tr. at 74.)

Plaintiff requested reconsideration (Tr. at 98), submitting a function report reiterating her limitations and activities (Tr. at 234-35). In this report, she further indicated that she had to re-read written instructions multiple times for full comprehension (Tr. at 239) and that changes in routine brought about by outside factors, rather than a change she initiated, triggered panic attacks (Tr. at 240).

In June 2016, the agency denied reconsideration (Tr. at 99-103) based on the review of Stacy Fiore, Psy.D., who also found no more than mild mental limitations (Tr. at 87), and Syd Foster, D.O., who found plaintiff capable of light work with occasional climbing due to her right hip surgery (Tr. at 89-90). The reviewers noted that the medical evidence continued to reveal normal mental status exams, intact memory and cognition, and normal gait and coordination. (Tr. at 86-88.) The reviewers concluded that, around the date last insured and closely afterwards, there was no evidence to show increased severity. Plaintiff healed well after her hip surgery, she had no end organ damage from diabetes, and her fibromyalgia and mixed orthopedic complaints physically limited her to light work. (Tr. at 90.) Mentally, the reviewers found no evidence from around or after the date last insured demonstrating a severe mental

5

impairment.  (Tr. at 87.)

**B.**     **Hearing Level**

    **1.**     **Treating Source Reports**

On August 17, 2016, plaintiff requested a hearing before an ALJ.  (Tr. at 104-05.)  Prior to the hearing, she submitted several reports from treating providers.

On November 3, 2017, John Lamberton, M.D., plaintiff's psychiatrist, completed a mental impairment medical source statement, indicating that plaintiff suffered from major depression and fibromyalgia.  (Tr. at 925.)  He indicated that plaintiff experienced severe fatigue, requiring her to lie down three to four hours during the day (Tr. at 925); that she would miss more than four days of work per month due to her symptoms and would need multiple unscheduled breaks during the workday (Tr. at 926); that she would be "off task" more than 30% of the workday and would perform at less than 50% efficiency compared to the average worker, but could perform work that involved detailed tasks (Tr. at 927); that she exhibited a somatic symptom disorder whereby psychological factors had an important role in causing or exacerbating her complaints (Tr. at 927); that she experienced at least "marked" limitation in three of the four "paragraph B" criteria of the mental impairments Listings: ability to interact with others, concentrating/persisting/maintaining pace, and adapting or managing oneself (Tr. at 928-29);[1] and that her mental disorder resulted in marginal adjustment, such that she had minimal capacity to adapt to changes (Tr. at 929.)

On November 16, 2017, Lynn Ollswang, LCSW, plaintiff's psychotherapist,  completed

---

[1]Dr. Lamberton checked "no" regarding the ability to understand, remember, and apply information.  (Tr. at 928.)  Under the Listings, a claimant will be found disabled if she has two "marked" or one "extreme" limitation in the paragraph B criteria.  See 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12(A)(2)(b).

an identical medical source statement, largely agreeing with Dr. Lamberton's conclusions. (Tr. at 930-34.) She indicated that plaintiff's severe fatigue would require her to lie down two to three hours during the day (Tr. at 930); that she would miss more than four days of work per month due to her symptoms and would need six or more unscheduled breaks during the workday (Tr. at 931); that she would be "off task" 30% of the workday and would perform at less than 50% efficiency compared to the average worker, but could perform work that involved detailed tasks (Tr. at 932); that emotional distress led to more experience of pain (Tr. at 932); that she experienced at least "marked" limitation in the same three paragraph B criteria noted by Dr. Lamberton (Tr. at 933-34); and that her mental disorder resulted in marginal adjustment (Tr. at 934.)

On November 22, 2017, David Hadcock, M.D., plaintiff's primary care physician, completed a musculoskeletal/fibromyalgia impairment medical assessment form listing a diagnosis of fibromyalgia and including a diagram mapping her tender point sites. (Tr. at 1116.) He further opined that plaintiff's symptoms would cause her to be "off task" more than 30% of the workday and cause her to perform at less than 50% efficiency; that she could stand/walk about two hours and sit about four hours in an eight hour workday; that she would need more than 10 unscheduled breaks of at least 10 minutes duration during an eight hour workday; that she needed to elevate her legs to waist level at least two hours during a typical eight hour daytime period; that she could lift no more than 10 pounds (Tr. at 1117); and that she could occasionally use her hands and fingers, right and left (Tr. at 1118). Finally, Dr. Hadcock indicated that plaintiff exhibited variable functioning and would likely be absent more than four days per month due to medical treatment or "bad days" with symptoms. (Tr. at 1118.)

Dr. Hadcock also completed an assessment of plaintiff's mental abilities, indicating that

plaintiff was unable to complete a normal workday/week without interruptions from symptoms causing an unreasonable number and length of rest periods; perform accurately and at a consistent pace; work in coordination with or proximity to co-workers without being distracted or distracting them; and deal with the stresses of skilled/semiskilled work. He opined that she would have noticeable difficulty performing activities within a schedule and being punctual within customary tolerances (distracted from job activity about 20% of the workday), and maintaining attention and concentration for at least two straight hours (distracted from job activity about 15% of the workday). He further indicated that she had no observable limits regarding her ability to understand, remember, and carry out simple and detailed instructions, and sustain an ordinary routine without special supervision. Finally, he indicated that she could interact appropriately with the general public but could not travel alone to the workplace. (Tr. at 1119.)

## 2. Testimony

On January 25, 2018, plaintiff appeared with counsel for her hearing. The ALJ also summoned a VE to testify. (Tr. at 35.)

### a. Plaintiff

Plaintiff testified that she had a college level education and previous work experience as a teacher from 2009-2011 and part-time employment (10 hours per week) as an office manager from June 2013 to January 2014. (Tr. at 41-43, 52.) She indicated that she was fired from the officer manager job; even though it was part-time, she would call in sick some days and not be able to catch up on work she missed; she also had trouble staying focused on work tasks. (Tr. at 52-53.) She had not worked or applied for work since 2014. (Tr. at 44, 50.) She

8

stood 5'5" tall and weighed 218 pounds currently, up from 190 in 2014-15, attributing her weight gain to medications. (Tr. at 50-51.) She was married with no children and lived with her husband. (Tr. at 41.) She had a driver's license but limited driving due to pain. (Tr. at 41-42.)

Asked why she had not been able to work in 2014 and 2015, plaintiff identified two major issues: pain and emotional problems. (Tr. at 44.) Plaintiff testified to pain spread all over her body due to fibromyalgia, most significantly in the lower back radiating to both sides, radiating down her right leg, and in her neck radiating through her upper back. She further reported pain in her hands and fingers. (Tr. at 45.) She also reported bad days, where the pain rated 10, occurring five to seven times a month. (Tr. at 45.)

As for the emotional issues, plaintiff testified to depression, characterized by crying spells, hopelessness, anger outbursts, lack of energy, and insomnia. She also reported daily panic attacks related to her anxiety, triggered by money issues or being in large crowds or unfamiliar areas, lasting from five to 30 minutes. (Tr. at 46, 54.) During a panic attack, she would cling to her husband or wrap herself in a blanket. (Tr. at 46-47.) She further testified that she rarely left the house alone, usually with her husband or parents. (Tr. at 54.) She stated that in the past month she had left her house alone twice, to go to doctor appointments. (Tr. at 55.) She reported similar kinds of problems in 2014 and 2015. (Tr. at 55.) She also reported problems with attention and concentration, such as difficulty following along with a movie plot or remembering what was said during conversations. (Tr. at 56.) Asked if things had gotten better since 2015, she indicated things had pretty much remained the same. (Tr. at 51.)

Plaintiff testified that she had medication to deal with her pain, but it did not help; resting and laying down provided some relief. (Tr. at 47.) She indicated that she would lay down four

9

to five hours a day to relieve her pain.  (Tr. at 48-49.)  She was also on medications for depression and anxiety symptoms, which she said did not help and caused some pretty bad side effects.  (Tr. at 47.)  For pain, they had tried Gabapentin, on which she "blew up like a balloon," and Tizanidine, on which she lost her hearing.  (Tr. at 48.)  She also tried Lyrica, which did not do anything.  (Tr. at 48.)  She had received injections, physical therapy, chiropractic, and radio-frequency abalation treatments, which did not help for more than a couple weeks.  (Tr. at 56.)  Plaintiff testified that she saw a counselor from 2013 to 2017 but stopped because she could no longer afford it.  (Tr. at 56.)

The ALJ noted that in her 2015 and 2016 function reports plaintiff reported activities such as light housework, shopping with her husband, and occasionally going to a baseball game with her husband.  Plaintiff testified that she rarely went to baseball games, and if they did go she would not make it through a game.  She shopped with her husband, more likely in the summer, about once per week.  (Tr. at 49.) She would do five minutes of housework before resting five minutes, then repeating, for about ½ hour total.  (Tr. at 50.)  In 2016, she took a trip to Arizona paid for by her parents.  (Tr. at 57.)

### b.    VE

The VE classified plaintiff's past relevant work as a teacher as a light, skilled job.  (Tr. at 59.)  The ALJ then asked a hypothetical question, assuming a person of plaintiff's age, education, and experience, limited to sedentary, unskilled work; unable to climb ladders, ropes, or scaffolds; limited to occasional climbing of stairs and ramps, stooping, crouching, kneeling, and crawling; and limited to jobs having no more than occasional changes in the work setting, and no more than occasional interaction with the public, co-workers, and supervisors.  (Tr. at 60.)  The VE testified that such a person could not perform plaintiff's past work but could do

other jobs such as sorter (46,000 positions nationally), assembler (72,000), and inspector (64,000). (Tr. at 60.) Adding an allowance to change positions at will between sitting and standing would reduce the numbers by 20%. (Tr. at 60-61.) Adding a limitation of no public interaction would not change the numbers. (Tr. at 62.)

If the person needed two additional unscheduled breaks of 10-15 minutes duration, the identified jobs would be eliminated—as would other unskilled jobs. (Tr. at 61.) Two absences per month on a consistent basis would not be tolerated by employers. (Tr. at 61-62.) Being off task 15% of the time would also preclude unskilled sedentary work (Tr. at 63), as would a limitation of occasional bilateral handing and fingering (Tr. at 65).

## C.    ALJ's Decision

On May 2, 2018, the ALJ issued an unfavorable decision. (Tr. at 12.) At step one, the ALJ determined that plaintiff did not engage in substantial gainful activity during the period from her alleged onset date of January 15, 2014, through her date last insured of December 31, 2015. (Tr. at 17.) At step two, he concluded that she had the severe impairments of fibromyalgia, cervical and lumbar degenerative disc disease, diabetes, status post right hip surgery, obesity, depression, and anxiety. (Tr. at 17.) At step three, he found that none of these impairments met or equaled a Listing. (Tr. at 17-19.)

Prior to step four, the ALJ determined that, through the date last insured, plaintiff had the RFC to perform sedentary work; allowed to change positions between sitting and standing at will; unable to climb ladders, ropes, or scaffolds; occasionally able to stoop, crouch, kneel, crawl, and climb ramps and stairs; limited to unskilled work and jobs involving only occasional decision-making, changes in the work setting, and interaction with co-workers and supervisors, and no interaction with the public. In making this finding, the ALJ considered plaintiff's alleged

symptoms and the medical opinion evidence. (Tr. at 20.)

In considering the symptoms, the ALJ acknowledged the required two-step process, under which he first had to determine whether plaintiff had an underlying impairment that could reasonably be expected to produce the symptoms alleged. Second, once such an impairment had been shown, the ALJ had to evaluate the intensity, persistence, and limiting effects of the symptoms to determine the extent to which they limited plaintiff's ability to work. For this purpose, if the statements were not substantiated by objective medical evidence, the ALJ had to consider the other evidence in the record to determine if plaintiff's symptoms limited her ability to work. (Tr. at 20.)

Plaintiff applied for benefits due to diabetes, fibromyalgia, cervical and lumbar degenerative disc disease, muscle spasms, right hip surgery, depression and anxiety (Tr. at 20, citing Tr. at 184-202), asserting that her conditions affected her abilities to lift, sit, stand, walk, squat, bend, reach, climb stairs, kneel, understand, remember, concentrate, and get along with others (Tr. at 20, citing Tr. at 206-16, 234-44). She indicated that she could sit for 45 minutes, stand for 30 minutes, walk a quarter mile, and lift up to 15 pounds. (Tr. at 20, citing Tr. at 206-16, 234-44.) As to her mental abilities, she initially alleged that she had no difficulties paying attention or following instructions, no difficulty interacting with authority figures, and could handle changes in routine. (Tr. at 20, citing Tr. at 206-16.) However, at the reconsideration level, she reported needing to reread written instructions, did not handle stress or change in routine well, and feared being judged by others. (Tr. at 20, citing Tr. at 234-44.)

At the hearing, plaintiff testified that she was unable to work due to chronic pain and mental health issues. She stated that her pain was concentrated around her lower back, right leg, and neck. (Tr. at 20.) She estimated that she experienced five to seven days per month

when the pain was 10 on a 10-point scale.  (Tr. at 20-21.)  She further testified that these symptoms were the same prior to her date last insured.  She also described depressive symptoms of crying spells, feelings of hopelessness and worthlessness, anger, insomnia, lack of energy, anxiety, and daily panic attacks occurring prior to her date last insured.  (Tr. at 21.)

The ALJ next reviewed the medical evidence, which documented plaintiff's complaints of pain in the neck, upper and lower back, with associated numbness, tingling, and weakness in her upper and lower extremities, fatigue, insomnia, irritability, decreased activity tolerance, and depression.  (Tr. at 21, citing Tr. at 297, 355, 403, 519, 544.)  In September 2014, she presented to a pain management physician, Steven Donatello, M.D., who noted on examination that her pain did not correspond to traditional fibromyalgia tender points.  Dr. Donatello ordered additional testing and felt non-opioid medication the best option for pain control.  (Tr. at 21, citing Tr. at 397, 403, 406.)

MRI studies of plaintiff's cervical spine performed in September 2014 showed minimal disc-osteophyte complex at levels C3-C6, no significant central canal narrowing, and minimal facet hypertrophic changes.  (Tr. at 21, citing Tr. at 401.)  A bone scan performed the same month was unremarkable except for uptake in the axial and appendicular skeleton.  (Tr. at 21, citing Tr. at 402.)

Plaintiff returned to pain management in March 2015, with exam at that time demonstrating 14 of 18 tender points.[2]  (Tr. at 21, citing Tr. at 521.)  A lumbar MRI obtained in May 2015 showed mild facet hypertrophy.  (Tr. at 21, citing Tr. at 534.)  Plaintiff's treatment plan in 2015 included trigger point and nerve block injections, radio-frequency ablation for her

---

[2]It appears plaintiff saw Dr. Berceanu at that time, not Dr. Donatello.  (Tr. at 519.)

13

cervical spine, physical therapy for her cervical and lumbar spine, and medication management. (Tr. at 21, citing Tr. at 451-517, 522, 528, 537, 552, 720, 723.) However, she reported only temporary relief from treatment. (Tr. at 21, citing Tr. at 403, 522, 537, 723.)

In August 2015, plaintiff sought treatment with an orthopedist for right hip pain, more severe, sharp, and intermittent than her fibromyalgia pain. (Tr. at 21, citing Tr. at 437.) A physical exam showed increased pain with hip range of motion, and MRI studies from September 2015 showed a labral tear without significant arthritic changes, as well as mixed impingement. (Tr. at 21, citing Tr. at 435.) Based on the relief obtained from a diagnostic injection, plaintiff's orthopedist recommended arthroscopic surgery (Tr. at 21, citing Tr. at 433), which she underwent in November 2015 (Tr. at 21, citing Tr. at 620), thereafter participating in physical therapy with complaints of hip soreness and groin pain (Tr. at 21, citing Tr. at 618, 657-89.)

The medical records also indicated that plaintiff had type 1 diabetes. She presented to endocrinology in February 2014, reporting she had not been testing her blood sugar regularly due to not having insurance. (Tr. at 21, citing Tr. at 301.) Her medications were adjusted due to a high A1c level (Tr. at 21, citing Tr. at 301), and repeat testing in September 2014 showed lower levels (Tr. at 21-22, citing Tr. at 356.) She received insulin pump therapy as part of her treatment regimen. (Tr. at 22, citing Tr. at 301.)

The record further revealed that plaintiff had been clinically obese throughout the relevant period. She stood about 5'5" tall, and her weight ranged from 193 to 207 pounds, producing a body mass index (BMI) of 32 to 34. (Tr. at 22, citing Tr. at 327, 354.) The ALJ recognized that plaintiff's obesity likely had an exacerbating effect on her other impairments. (Tr. at 22.)

14

Due to the combination of her physical impairments, the ALJ found that plaintiff would not likely be able to sustain the demands of light work and thus limited her to sedentary work. Due to her fibromyalgia and mild cervical and lumbar degenerative disc disease, she required the ability to alternate between sitting and standing at will. These conditions further precluded her from climbing ladders, ropes, or scaffolds, and limited her to occasional postural movements. (Tr. at 22.)

Concerning her mental health, the record reflected that plaintiff endorsed numerous symptoms of depression and anxiety primarily stemming from her chronic pain. Specifically, she reported depressed mood, crying spells, feelings of anxiety with panic attacks, sadness, inadequacy, low interest, irritability, sleep disturbance, and problems with concentration and attention (Tr. at 22, citing Tr. at 309-36, 573-600, 945-93), and exhibited a depressed mood with flat affect during examinations (Tr. at 22, citing Tr. at 328, 521, 406, 579, 582). She had been diagnosed with major depression and panic/anxiety disorders (Tr. at 22, citing Tr. at 424, 593) and sought treatment with a psychotherapist and psychiatrist, who prescribed various medications (Tr. at 22, citing Tr. at 573-600).

Due to her severe mental impairments, the ALJ found plaintiff limited to unskilled work involving only occasional decision-making and occasional changes in the work setting. Her reported symptoms of irritability and anxiety further restricted her to no interaction with the public and occasional interaction with co-workers and supervisors. (Tr. at 22.)

The ALJ then concluded that while plaintiff's medically determinable impairments could reasonably be expected to cause the symptoms she alleged, her statements concerning the intensity, persistence, and limiting effects of these symptoms were not entirely consistent with the medical evidence and other evidence in the record. The ALJ provided several reasons for

15

this conclusion.  (Tr. at 22.)

First, the ALJ found that the medical evidence did not fully substantiate plaintiff's allegations of disabling physical symptoms.  Despite her claims of numbness and weakness of her upper and lower extremities, and severe pain, physical examinations consistently noted full motor strength and function in all her extremities, intact sensation, normal deep tendon reflexes, and generally documented a coordinated and balanced normal gait.  (Tr. at 22, citing Tr. at 397, 406, 521, 535.)  Additionally, objective MRI evidence showed only mild findings.  (Tr. at 22, citing Tr. at 401, 534.)

Second, the ALJ noted that plaintiff reported some benefit from treatment.  Specifically, plaintiff was prescribed physical therapy as part of her fibromyalgia treatment plan, and the therapist noted that plaintiff's comfort in her daily activities was increasing and her pain levels decreasing.  (Tr. at 23, citing Tr. at 465, 467, 472, 485, 490.)  She also appeared to receive benefit from medication, as she continued to seek refills of Lyrica and Percocet.  (Tr. at 23, citing Tr. at 720, 726.)  Finally, the records showed that she obtained a good result from her right hip surgery; less than a week later, she demonstrated good range of motion, only a small amount of discomfort with external rotation, with good flexion, strength, and leg raising (Tr. at 23, citing Tr. at 618), and on completion of physical therapy, she reported her hip was feeling fine (Tr. at 23, citing Tr. at 667.)[3]

Third, plaintiff made inconsistent statements to providers.  Contrary to her allegations,

---

[3]The ALJ cited exhibit 18F/11 (Tr. at 667), a January 5, 2016 note, from roughly the middle of plaintiff's hip therapy program.  Subsequent notes indicate that plaintiff reported improvement.  For instance, on February 3, 2016, she reported: "hip is feeling well" (Tr. at 677), and on February 4, 2016, she reported: "Hip is feeling fine" (Tr. at 679).  On February 11, 2016, she indicated her "hip has gotten better" (Tr. at 682), and she discharged from therapy at that time, having met identified functional goals (Tr. at 683-84).

plaintiff indicated in several pain questionnaires at physical therapy that her pain caused no trouble sleeping, she could do most of her recreational activities, she did not normally change the way she managed her personal care, pain did not affect her ability to travel, she could concentrate with no difficulty, and her pain was slowing improving. (Tr. at 23, citing Tr. at 490, 500-02, 507-08.)

Fourth, regarding her diabetes, plaintiff alleged no symptoms and the record reflected no functional impairments stemming from this condition. The record also indicated a degree of noncompliance with treatment, with plaintiff admitting that she was unmotivated to consistently manage her diabetic care. (Tr. at 23, citing Tr. at 301, 351, 1141.)

Fifth, concerning her mental impairments, the record likewise did not fully substantiate plaintiff's allegations of disabling symptoms. Although she sought counseling/therapy, this treatment was sporadic, with most of her counseling sessions taking place outside the relevant period. (Tr. at 23, citing Tr. at 945-93.) Treatment with a psychologist was also routine and conservative. (Tr. at 23, citing Tr. at 736-47.) Objective mental status exams generally demonstrated good mental functioning; she consistently appeared well-groomed, cooperative and engaged, with normal thought content and processes, normal speech, good attention/concentration, intact cognition and memory, and good insight and judgment. (Tr. at 23, citing Tr. at 350-430, 573-600, 946, 951.) Plaintiff also reported that medications were helpful for her symptoms. (Tr. at 23, citing Tr. at 361, 580, 587.)

Sixth, plaintiff engaged in a number of activities suggesting greater mental capacity than alleged. She reported to her psychotherapist in January 2016 that she had been listing and selling items on Ebay, with a goal of listing three items each day; inconsistent with her claims that she was rarely able to leave her home and was unable to interact with people in public, she

17

reported in April 2016 that she and her husband frequently eat out and shop at Goodwill for items to keep and sell;[4] and she provided a work schedule documenting her Ebay activities to her psychotherapist in August 2016, which suggested that she was engaging in a higher level of functioning than alleged and also retained a greater mental capacity than claimed. (Tr. at 23, citing Tr. at 206-16, 234-44, 987, 988.) Plaintiff was also able to take overnight trips, attend baseball games and the state fair, and travel to Arizona, activities inconsistent with the extremely limited functioning she alleged. (Tr. at 23-24, citing Tr. at 361, 466, 479, 489.)

As for the opinion evidence, the ALJ gave partial weight to the reports of the agency medical consultants, Drs. Chan and Foster. At the initial level, Dr. Chan found plaintiff capable of light work. On reconsideration, Dr. Foster affirmed that determination but added postural limitations to accommodate the residual effects of plaintiff's right hip surgery. (Tr. at 24, citing Tr. at 68-79, 80-92.) The ALJ noted that the consultants reviewed the evidence of record using professional expertise and specialized knowledge in assessing physical impairments under social security guidelines. The ALJ found that while these opinions were generally consistent with the evidence of record showing plaintiff had good physical functioning on examination (e.g., mild or no limitation in range of motion, full muscle strength, intact sensation, and normal coordination, gait and balance), a good result from right hip surgery, and minimal findings on objective diagnostic testing, Drs. Chan and Foster did not have the opportunity to examine plaintiff or review the entire record presented at the hearing level, which supported a limitation to sedentary work. (Tr. at 24.)

The ALJ next considered the November 2017 fibromyalgia statement from Dr. Hadcock,

---

[4]This report is found in an April 5, 2016, therapy note (Tr. at 991), which the ALJ cited earlier in his decision (Tr. at 19, citing Ex. 31F/47).

plaintiff's primary care physician. Dr. Hadcock opined that plaintiff would be off-task more than 30% of the workday and 50% less efficient than other employees; could lift up to 10 pounds, stand and walk for two hours, and sit for four hours per eight-hour day; required more than 10 additional breaks each day; needed to elevate her legs to waist level for at least two hours per day; could occasionally handle and finger with the bilateral upper extremities; and would be absent more than four days per month. (Tr. at 24, citing Tr. at 1116-20.)

The ALJ acknowledged that Dr. Hadcock was a treating physician, who had the benefit of observing and examining plaintiff throughout the period at issue. However, the ALJ gave his opinions little weight. The ALJ found his opinions inconsistent with his treatment notes and not supported by acceptable clinical findings or laboratory diagnostic techniques. For example, although Dr. Hadcock stated his opinions were based upon a diagnosis of fibromyalgia—and he included a diagram outlining 15 tender points sites—Dr. Hadcock's treatment notes reflect no tender point examination prior to or during the period at issue. (Tr. at 24, citing Tr. at 354, 363, 417, 424.) Further, despite an annotation on the form requesting Dr. Hadcock limit his opinions to the period prior to the date last insured, he completed the assessment jointly with plaintiff in November 2017, raising a question as to whether his opinions were based solely on plaintiff's subjective reports or upon his clinical finding during the period at issue. (Tr. at 24, citing Tr. at 1131.)[5] Finally, the ALJ saw "no basis in the records for a limitation for elevating [plaintiff's] legs above waist level, or . . . for a limitation for handling and fingering with the upper extremities." (Tr. at 24.)

_____

[5]The cited note indicates that on November 22, 2017, plaintiff and her husband saw Dr. Hadcock, seeking completion of disability paperwork. "Her forms were completed jointly, transparently." (Tr. at 1131.)

In addition to his physical RFC opinions, Dr. Hadcock also completed a psychological RFC form, opining that plaintiff would have no ability to deal with the stress of skilled or semiskilled work, work at a consistent pace, or complete a normal workday/week without interruptions from symptoms causing an unreasonable number and length of rest periods. (Tr. at 25, citing Tr. at 1119.) The ALJ gave these opinions little weight as they were outside Dr. Hadcock's expertise and were inconsistent with his treatment notes and the mental health treatment records documenting good mental functioning on mental status examinations. (Tr. at 25, citing Tr. at 355, 364, 573-600.)

With regard to the mental opinion evidence, the ALJ gave partial weight to the opinions of the agency psychological consultants, Drs. King and Fiore, both of whom opined that plaintiff would have no more than mild limitations under the paragraph B criteria and that her mental impairments were thus non-severe. (Tr. at 25, citing Tr. at 68-79, 80-92.) The ALJ noted that these consultants have specialized knowledge in evaluating mental impairments under social security standards. However, while their opinions in this case were generally consistent with treatment records documenting good mental functioning during mental status examinations, Drs. King and Fiore did not personally observe or examine plaintiff or review the entire record, which documented ongoing mental health symptoms due to reports of chronic pain, fluctuating in frequency and intensity, although not of the severity plaintiff alleged. (Tr. at 25, citing Tr. at 328, 364, 397, 573-600.)

The ALJ also gave partial weight to the November 2017 opinion of Dr. Lamberton, plaintiff's psychiatrist, who concluded that plaintiff would have marked limitations in all of the

paragraph B areas of mental functioning, resulting in marginal adjustment.[6] (Tr. at 25, citing Tr. at 925-29.) The ALJ acknowledged that Dr. Lamberton is a mental health specialist who had the opportunity to personally observe and examine plaintiff. However, the ALJ determined that his opinions were somewhat extreme and inconsistent with his treatment notes, which generally documented normal mental status evaluation findings (e.g., well-groomed, cooperative, normal speech and thought processes, intact memory and cognition, good insight and judgment). (Tr. at 25.) The ALJ further noted that, with the degree of limitation Dr. Lamberton assigned, it would be reasonable to assume plaintiff would require aggressive treatment such as hospitalization or placement in a long-term care facility, while plaintiff in fact required only routine and conservative care. (Tr. at 25-26.)

Finally, the ALJ considered the statements of psychotherapist Ollswang, who completed a report in November 2017. (Tr. at 26, citing Tr. at 930.) Ollswang opined that plaintiff had marked limitations in all of the paragraph B areas of mental functioning (except for understanding, remembering, and applying information), as well as marginal adjustment. (Tr. at 26, 933.) The ALJ assigned partial weight to Ollswang's opinions for the same reasons given for the opinions of Dr. Lamberton, further noting that her opinions were rendered long after plaintiff's date last insured and did not appear to be based on treatment provided during that time. (Tr. at 26.)

In sum, the ALJ found the RFC finding supported by the opinions of Drs. Chan, Foster, King, Fiore, Hadcock, and Lamberton, and by the overall record. Plaintiff remained capable of a range of sedentary work during the relevant period. (Tr. at 26.)

---

[6]The ALJ was wrong about understanding, remembering, and applying information, as Dr. Lamberton checked "no" in that area. (Tr. at 928.)

21

At step four, the ALJ concluded that plaintiff could no longer perform her past skilled work as a teacher. (Tr. at 26-27.) At step five, however, he found that she could perform other, unskilled jobs as identified by the VE, including sorter, assembler, and inspector. (Tr. at 27-28.) The ALJ accordingly found plaintiff not disabled from January 15, 2014, the alleged onset date, through December 31, 2015, the date last insured. (Tr. at 28.)

On January 10, 2019, the Appeals Council denied plaintiff's request for review (Tr. at 1), making the ALJ's decision the final decision of the Commissioner on plaintiff's application. See Prater, 947 F.3d at 481. This action followed.

## III. DISCUSSION

### A. Treating Provider Opinions

Plaintiff first argues that the ALJ improperly rejected the reports from her treating providers. (Pl.'s Br. at 5.) Under the regulation applicable to plaintiff's claim, the medical opinion of a claimant's treating physician is entitled to "controlling weight" if well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence in the record. Gerstner v. Berryhill, 879 F.3d 257, 261 (7th Cir. 2018); 20 C.F.R. § 404.1527 ("Evaluating opinion evidence for claims filed before March 27, 2017."). If the opinion does not meet the test for controlling weight, the ALJ must decide how much value it does have by considering a variety of factors, including the length, nature, and extent of the treatment relationship; the support offered by the source for the opinion; the consistency of the opinion with the record as a whole; the physician's specialty, if any; and the source's understanding of social security disability programs and their evidentiary requirements. 20 C.F.R. § 404.1527(c).

22

The opinions of non-examining agency consultants are evaluated under these same factors, i.e., supportability, consistency, and expertise. Id.; Haynes v. Barnhart, 416 F.3d 621, 630 (7th Cir. 2005). Similarly, opinions from non-physician medical sources (e.g., therapists), while they may not receive controlling weight, must also be considered using these factors. 20 C.F.R. § 404.1527(f); see Barrett v. Barnhart, 355 F.3d 1065, 1067 (7th Cir. 2004).

The ALJ must give "good reasons" for discounting the opinion of a treating source. 20 C.F.R. § 404.1527(c)(2). However, this does not mean a treating physician's opinion constitutes the final word on a claimant's disability. Schmidt v. Astrue, 496 F.3d 833, 842 (7th Cir. 2007); see also Thomas v. Colvin, 745 F.3d 802, 808 (7th Cir. 2014) ("RFC is a matter for the ALJ alone—not a treating or examining doctor—to decide."). The ALJ must base his RFC determination on the entire record and "is not required to rely entirely on a particular physician's opinion or choose between the opinions any of the claimant's physicians." Schmidt, 496 F.3d at 845. The ALJ may discount a treating physician's opinion if it is conclusory, inconsistent with the opinions of other physicians or with the doctor's own treatment notes, or based solely on the claimant's subjective complaints, see, e.g., Loveless v. Colvin, 810 F.3d 502, 507 (7th Cir. 2016); Henke v. Astrue, 498 Fed. Appx. 636, 640 (7th Cir. 2012); Ketelboeter v. Astrue, 550 F.3d 620, 625 (7th Cir. 2008); Schmidt, 496 F.3d at 842, so long as he minimally articulates his rationale, Elder v. Astrue, 529 F.3d 408, 415 (7th Cir. 2008).

### 1. Dr. Lamberton

As indicated above, Dr. Lamberton, plaintiff's psychiatrist, endorsed a number of work-preclusive limitations. (Tr. at 925-29.) The ALJ acknowledged Dr. Lamberton's specialty and treatment relationship with plaintiff, see 20 C.F.R. §§ 404.1527(c)(1), (2), & (5), but nevertheless gave his opinions only partial weight. First, the ALJ determined that Dr.

Lamberton's opinions were somewhat extreme and inconsistent with his treatment notes, which generally documented normal mental status evaluation findings. Second, the ALJ stated that, given the degree of limitation Dr. Lamberton assigned, it would be reasonable to assume plaintiff would require aggressive treatment such as hospitalization or placement in a long-term care facility, rather than the routine, conservative care she actually received. (Tr. at 25-26.)

I agree with plaintiff that the ALJ's second reason is problematic. (See Pl.'s Br. at 8, Pl.'s Rep. Br. at 4.) While the regulations require ALJs to consider the nature and extent of the treatment relationship, see 20 C.F.R. § 404.1527(c)(2), they must resist the temptation to offer their own opinions on what sort of treatment would be appropriate. See Voigt v. Colvin, 781 F.3d 871, 876 (7th Cir. 2015); Myles v. Astrue, 582 F.3d 672, 677 (7th Cir. 2009). Further, as the Seventh Circuit has noted, the "institutionalization of the mentally ill is generally reserved for persons who are suicidal, otherwise violent, demented, or (for whatever reason) incapable of taking even elementary care of themselves." Voigt, 781 F.3d at 876.

Nevertheless, this does not require remand. As the ALJ detailed earlier in his decision, plaintiff received only sporadic treatment during the relevant period; objective mental status exams from providers generally demonstrated good mental functioning; and plaintiff reported that medications helped her symptoms. (Tr. at 23.) The ALJ stood on solid ground in comparing the significant limitations in Dr. Lamberton's report with the treatment plaintiff actually received. See Schreiber v. Colvin, 519 Fed. Appx. 951, 958 (7th Cir. 2013) ("The ALJ found that the notes, which indicated improvement in Schreiber's condition with medication and counseling, were inconsistent with the significant limitations in Dr. Belford's assessment. He also found her assessment inconsistent with the level of treatment she provided Schreiber—a

24

fifteen-minute visit every two to three months.").[7]  The ALJ also partially credited the opinions

of the agency psychological consultants, both of whom found, contrary to Dr. Lamberton, that

plaintiff's mental impairments caused no more than mild limitations under the paragraph B

criteria.  (Tr. at 25.)  The ALJ noted the consultants' expertise in disability evaluation, see 20

C.F.R. § 404.1527(c)(6), and found their opinions generally consistent with treatment records

documenting good mental functioning during mental status examinations.[8]  See Skarbek v.

Barnhart, 390 F.3d 500, 503 (7th Cir. 2004) ("An ALJ may discount a treating physician's

medical opinion if it is inconsistent with the opinion of a consulting physician[.]").

　　More importantly, plaintiff does not factually dispute the first reason provided by the

ALJ—the inconsistency of the opinion with Dr. Lamberton's own treatment notes—and the

Seventh Circuit has regularly upheld this as a valid basis for discounting a treating source

report.  See Figved v. Colvin, 103 F. Supp. 3d 954, 966 (N.D. Ill. 2015) (collecting cases).

Plaintiff contends that normal mental status exams during a time when she was not employed

say little about how she would function in the workplace.  (Pl.'s Br. at 7.)  Perhaps the ALJ

could have discounted the exam findings based on this distinction, but I cannot conclude that

he was required do so.[9]  See Freeman United Coal Mining Co. v. Benefits Review Bd., United

---

[7]In reply, plaintiff notes that she received more significant treatment than did the
claimant in Schreiber (Pl.'s Rep. Br. at 3-4), but the point of the citation is that an ALJ is
permitted to consider the extent of treatment provided in evaluating a treating source opinion.

[8]As indicated above, the ALJ declined to fully endorse the consultants' reports, noting
that they did not personally observe or examine plaintiff or review the entire record, see 20
C.F.R. §§ 404.1527(c)(1) & (4), which documented ongoing mental health symptoms due to
reports of chronic pain, fluctuating in frequency and intensity, although not of the severity
plaintiff alleged.  (Tr. at 25.)

[9]Since claimants cannot receive benefits while engaged in substantial gainful activity,
observations in treatment notes will often be made while the person is unemployed.  The

States Dep't of Labor, 909 F.2d 193, 195 (7th Cir. 1990) ("It is for the ALJ to weigh conflicting evidence and draw inferences from it; a reviewing court may not draw contrary inferences merely because they appear more reasonable[.]"); see also Stepp v. Colvin, 795 F.3d 711, 718 (7th Cir. 2015) ("We uphold all but the most patently erroneous reasons for discounting a treating physician's assessment.") (internal quote marks omitted). Plaintiff also notes her statements that stress exacerbates her symptoms. (Pl.'s Br. at 7-8, citing SSR 85-15 (noting that the reaction to the demands of work stress is highly individualized).) The ALJ considered plaintiff's subjective reports, as will be discussed below, finding them not entirely consistent with the record, including her activities.

Finally, as the Commissioner notes, the ALJ did not entirely discount Dr. Lamberton's report but rather gave it partial weight. (Def.'s Br. at 13.) For instance, Dr. Lamberton opined that plaintiff would have difficulty with workplace changes and interacting with others (Tr. at 928-29), and the ALJ limited her to only occasional changes in the work setting, occasional interaction with co-workers, and no interaction with the public (Tr. at 20).

**2.    Therapist Ollswang**

Ollswang, plaintiff's psychotherapist, prepared a report endorsing similar mental limitations. (Tr. at 930-34.) For the same reasons, the ALJ also assigned partial weight to her opinions, further noting that she prepared her report long after plaintiff's date last insured and that her opinions did not appear to be based on treatment provided during the relevant time

_____

regulations nevertheless require ALJs to determine whether treating source opinions are supported by and consistent with the objective medical evidence. 20 C.F.R. § 404.1527(c)(3) & (4). As plaintiff notes in reply, the regulations recognize that a claimant may function differently in familiar and unfamiliar situations. (Pl.'s Rep. Br. at 3.) The ALJ considered plaintiff's claims in this regard, finding them inconsistent with some of her activities, including shopping, going to the state fair, and attending baseball games. (Tr. at 23-24.)

26

period.  (Tr. at 26.)

As plaintiff notes, evidence cannot be rejected simply because it post-dates the relevant period.  (Pl.'s Br. at 9, citing <u>Parker v. Astrue</u>, 597 F.3d 920, 925 (7th Cir. 2010).)  But the ALJ did not reject the report outright on this basis; moreover, it was reasonable for the ALJ to note that the report conflicted with plaintiff's treatment records during the relevant period.  <u>See Cohen v. Astrue</u>, 258 Fed. Appx. 20, 27-28 (7th Cir. 2007) (discounting retrospective report as inconsistent with contemporaneous evidence).  Plaintiff also notes that Ollswang's opinions are consistent with Dr. Lamberton's, who treated her prior to the date last insured and opined to similar limitations during the relevant time.  (Pl.'s Br. at 9, Pl.'s Rep. Br. at 4.)  However, the ALJ explained why Dr. Lamberton's opinions deserved only partial weight.

### 3.    Dr. Hadcock

Plaintiff's primary care physician, Dr. Hadcock, prepared reports assessing plaintiff's physical and mental functioning, also endorsing a number of work-preclusive limitations.  (Tr. at 1116-19.)  As with Dr. Lamberton, the ALJ acknowledged that Dr. Hadcock was a treating physician, who had the benefit of observing and examining plaintiff throughout the period at issue.  <u>See</u> 20 C.F.R. § 404.1527(c)(2).  Nevertheless, for a number of reasons, the ALJ gave Dr. Hadcock's opinions little weight: the opinions were inconsistent with his treatment notes and not supported by acceptable clinical findings or laboratory diagnostic techniques (e.g., Dr. Hadcock's treatment notes reflect no tender point examination prior to or during the period at issue); Dr. Hadcock completed the assessment jointly with plaintiff in November 2017, raising a question as to whether his opinions were based solely on plaintiff's subjective reports; the records contained no basis for a requirement that plaintiff elevate her legs to waist level or limit handling and fingering to occasionally; and the mental limitations fell outside Dr. Hadcock's

27

expertise and were inconsistent with his treatment notes and the mental health treatment records documenting good mental functioning.  (Tr. at 24-25.)

The ALJ also stood on solid ground in discounting Dr. Hadcock's reports on these bases. See, e.g., Britt v. Berryhill, 889 F.3d 422, 426 (7th Cir. 2018) ("An ALJ can give less than controlling weight to medical opinions based on subjective reports and can even reject a doctor's opinion entirely if it appears based on a claimant's exaggerated subjective allegations."); White v. Barnhart, 415 F.3d 654, 660 (7th Cir. 2005) (discounting opinion that strayed from physiatrist's area of expertise and opined that the claimant had a psychiatric disorder); Talbert v. Berryhill, No. 17-C-1633, 2019 U.S. Dist. LEXIS 10114, at *66 (E.D. Wis. Jan. 18, 2019) ("Certainly it was reasonable for the ALJ to note, as part of her analysis, that the doctor also included significant limitations for which there was no medical support."); Ryan v. Colvin, No. 15-cv-01586-LTB, 2016 U.S. Dist. LEXIS 54135, at *24-28 (D. Colo. Apr. 21, 2016) (discounting report in part because doctor and claimant completed it together).  Dr. Hadcock's opinion also conflicted with the reports of the agency medical consultants, which the ALJ partially credited.  See Dixon v. Massanari, 270 F.3d 1171, 1178 (7th Cir. 2001) ("When treating and consulting physicians present conflicting evidence, the ALJ may decide whom to believe, so long as substantial evidence supports that decision.").

Plaintiff acknowledges that it is appropriate for an ALJ to consider the extent to which an opinion is supported by and consistent with the other evidence, see 20 C.F.R. §§ 404.1527(c)(3) & (4), and she concedes that in this case Dr. Hancock's treatment notes contain no tender point examinations.  However, she notes that records from other providers do contain such examinations.  (Pl.'s Br. at 10, Pl.'s Rep. Br. at 1.)  The ALJ acknowledged the records documenting such exams (Tr. at 21, citing Tr. at 521), and he accepted fibromyalgia as a

severe impairment which limited plaintiff to a reduced range of sedentary work (Tr. at 22).  See SSR 96-9p, 1996 SSR LEXIS 6, at *1 ("An RFC for less than a full range of sedentary work reflects very serious limitations resulting from an individual's medical impairment(s) and is expected to be relatively rare.").  Plaintiff fails to explain how the ALJ committed reversible error in discounting Dr. Hadcock's opinion of even greater limitations based in part on the lack of substantiation in Dr. Hadcock's own treatment records.  See Stetter v. Saul, No. 18-C-1100, 2019 U.S. Dist. LEXIS 161917, at *30 (E.D. Wis. Sept. 23, 2019) (noting that ALJ may discount treating physician opinion that lacked substantiation in his earlier treatment notes).

Plaintiff next notes that doctors are allowed to rely on their patients' subjective statements as an essential diagnostic tool.  (Pl.'s Br. at 10.)  While evidence should not be rejected outright for this reason alone, see Brown v. Barnhart, 298 F. Supp. 2d 773, 792-93 (E.D. Wis. 2004), an ALJ is permitted to consider the extent to which a treating physician's limitations are based on the claimant's subjective reports rather than objective findings.  See Loveless, 810 F.3d at 507 ("Here, the ALJ properly discounted Dr. Cusack's medical opinion that rests entirely on the claimant's subjective complaints."); Rice v. Barnhart, 384 F.3d 363, 371 (7th Cir. 2004) ("[M]edical opinions upon which an ALJ should rely need to be based on objective observations and not amount merely to [a] citation of a claimant's subjective complaints.").[10]

---

[10]In reply, plaintiff notes that Dr. Hadcock's opinion is based not just on her statements but also on a diagnosis of fibromyalgia, which is established in the record.  (Pl.'s Rep. Br. at 2.)  However, the mere diagnosis of an impairment does not establish the severity of the impairment.  Philpott v. Colvin, No. 1:13-cv-01708-JMS-DKL, 2014 U.S. Dist. LEXIS 118659, at *10 (S.D. Ind. Aug, 26, 2014); see Estok v. Apfel, 152 F.3d 636, 640 (7th Cir. 1998) ("It is not enough to show that she had received a diagnosis of fibromyalgia with a date of onset prior to the expiration of the insured period, since fibromyalgia is not always (indeed, not usually) disabling.").

Plaintiff further argues that the record <u>does</u> contain support for leg elevation and manipulative limitations. Specifically, she cites medical notes in which she reported that laying down relieved her pain and complained of numbness and weakness in her arms and hands. (Pl.'s Br. at 11.) However, she points to no objective medical evidence supporting such limitations.[11]  <u>See</u> <u>Britt</u>, 889 F.3d at 426 ("No objective medical evidence postdating Britt's alleged onset date supports his allegation that he must elevate his leg at work."); <u>Arnold v. Barnhart</u>, 473 F.3d 816, 823 (7th Cir. 2007) ("Although a claimant can establish the severity of his symptoms by his own testimony, his subjective complaints need not be accepted insofar as they clash with other, objective medical evidence in the record.").[12]

Finally, plaintiff contends that there is no indication Dr. Hadcock based the non-exertional limitations solely on mental impairments, as opposed to pain and/or medication side effects. (Pl.'s Br. at 12-13.) However, Dr. Hadcock provided no such explanation on the form, and the ALJ was required by regulation to consider Dr. Hadcock's specialty in evaluating the report.  <u>See</u> 20 C.F.R. § 404.1527(c)(5). Plaintiff challenges the ALJ's inference that these limitations related to mental impairments (Pl.'s Rep. Br. at 2-3), but as indicated above, it is the ALJ's job, not the court's, to weigh conflicting evidence and draw inferences from it.

---

[11]Nor does she explain how her statements that she experienced pain relief from laying down translates into a requirement that she elevate her legs to waist level while at work.

[12]In reply, plaintiff accuses the Commissioner of improper post hoc argument in relying on the absence of objective medical evidence. (Pl.'s Rep. Br. at 2.) The ALJ stated that "there is no basis in the records for a limitation for elevating the claimant's legs above waist level, or a limitation . . . for handling and fingering with the upper extremities (Ex. 35F)." (Tr. at 24.) Plaintiff argues that the ALJ did not specify that there is no <u>objective</u> basis for these limitations, but that is a reasonable reading of his decision. Moreover, as discussed elsewhere in this decision, the ALJ considered plaintiff's subjective claims of upper extremity weakness and numbness, finding those claims inconsistent with the exam findings. (Tr. at 22.)

**B.      Plaintiff's Statements**

Plaintiff next argues that the ALJ erred in evaluating her subjective statements.  In evaluating a claimant's statements regarding her symptoms, the ALJ must first determine whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the alleged symptoms.  SSR 16-3p, 2016 SSR LEXIS 4, at *5. Second, if the claimant has such an impairment, the ALJ must evaluate the intensity and persistence of the symptoms to determine the extent to which they limit the claimant's ability to work.  Id. at *9.  If the statements are not substantiated by objective medical evidence, the ALJ must evaluate the intensity, persistence, and limiting effects of the alleged symptoms based on the entire record and considering a variety of factors, including the claimant's daily activities, factors that precipitate and aggravate the symptoms, and the treatment she has received for relief of the pain or other symptoms.  Id. at *18-19.

The court gives an ALJ's credibility finding special deference, reversing only if it is "patently wrong."  Summers v. Berryhill, 864 F.3d 523, 528 (7th Cir. 2017).  While the ALJ must provide specific reasons for his finding, consistent with the regulatory factors and supported by the evidence, see, e.g., Shauger v. Astrue, 675 F.3d 690, 697-98 (7th Cir. 2012), he "need not specify which statements were not credible."  Shideler, 688 F.3d at 312.

As indicated above, in the present case the ALJ followed the required two-step process, finding that while plaintiff's medically determinable impairments could reasonably be expected to cause the symptoms alleged, her statements concerning the intensity, persistence, and limiting effects of these symptoms were not entirely consistent with the evidence in the record. He provided six reasons for this conclusion: (1) the medical evidence did not fully substantiate plaintiff's allegations of disabling physical symptoms, with examinations noting full motor

31

strength and function in all extremities, intact sensation, normal deep tendon reflexes, and generally normal gait, and objective MRI evidence showing only very mild findings; (2) plaintiff reported some benefit from treatment, including physical therapy, medication, and hip surgery; (3) plaintiff made inconsistent statements to providers, indicating that she could do most of her recreational activities, she did not normally change the way she managed her personal care, pain did not affect her ability to travel, she could concentrate with no difficulty, and her pain was slowing improving; (4) regarding her diabetes, plaintiff alleged no symptoms, the record documented no functional impairments stemming from this condition, and plaintiff at times failed to comply with treatment; (5) concerning her mental impairments, plaintiff received sporadic treatment, objective mental status exams generally demonstrated good mental functioning, and plaintiff reported that medications were helpful; and (6) plaintiff engaged in a number of activities (e.g., selling items on Ebay, going out to eat, taking trips, attending baseball games) suggesting greater mental capacity than alleged.  (Tr. at 23-24.)

Plaintiff faults the ALJ for relying on the objective medical evidence, noting that she suffers from fibromyalgia, the severity of which cannot be objectively measured, and that her pain is further exacerbated by her mental health conditions/somatic disorder.  (Pl.'s Br. at 15, Pl.s' Rep. Br at 5.)  While subjective complaints may not be discounted "just because a determinable basis for pain of that intensity does not stand out in the medical record," Moss v. Astrue, 555 F.3d 556, 561 (7th Cir. 2009); see also Carradine v. Barnhart, 360 F.3d 751, 754 (7th Cir. 2004) ("If pain is disabling, the fact that its source is purely psychological does not disentitle the applicant to benefits."), the ALJ is permitted—indeed, required—to consider the objective medical evidence as part of his analysis.  See Simila v. Astrue, 573 F.3d 503, 519 (7th Cir. 2009) ("Carradine does not imply that an ALJ can never consider the lack of objective

evidence in rejecting a claimant's subjective complaints. Such a reading would nullify 20 C.F.R.

§ 404.1529(c)(2) and (4), which require an ALJ to consider the objective medical evidence.").

As SSR 16-3p explains:

Symptoms cannot always be measured objectively through clinical or laboratory diagnostic techniques. However, objective medical evidence is a useful indicator to help make reasonable conclusions about the intensity and persistence of symptoms, including the effects those symptoms may have on the ability to perform work-related activities[.]. We must consider whether an individual's statements about the intensity, persistence, and limiting effects of his or her symptoms are consistent with the medical signs and laboratory findings of record.

The intensity, persistence, and limiting effects of many symptoms can be clinically observed and recorded in the medical evidence. Examples such as reduced joint motion, muscle spasm, sensory deficit, and motor disruption illustrate findings that may result from, or be associated with, the symptom of pain. These findings may be consistent with an individual's statements about symptoms and their functional effects. However, when the results of tests are not consistent with other evidence in the record, they may be less supportive of an individual's statements about pain or other symptoms than test results and statements that are consistent with other evidence in the record.

For example, an individual with reduced muscle strength testing who indicates that for the last year pain has limited his or her standing and walking to no more than a few minutes a day would be expected to have some signs of muscle wasting as a result. If no muscle wasting were present, we might not, depending on the other evidence in the record, find the individual's reduced muscle strength on clinical testing to be consistent with the individual's alleged impairment-related symptoms.

2016 SSR LEXIS 4, at *10-12. Thus, while it would have been improper for the ALJ to reject

plaintiff's claims based solely on the objective medical evidence, the findings of full motor

strength and function in all extremities were relevant.[13] Further, to the extent plaintiff alleged

disability in part due to degenerative disc disease, the mild findings on MRI scans were also

---

[13]In reply, plaintiff notes that the record does contain objective evidence of fibromyalgia, by way of trigger point exams. (Pl.'s Rep. Br. at 5.) As indicated above, the ALJ acknowledged this evidence (Tr. at 21), and the mere diagnosis of the impairment does not establish disabling severity. See Estok, 152 F.3d at 640.

relevant.

Plaintiff argues that the ALJ ignored instances in which her gait was noted be antalgic (Pl.'s Br. at 15, Pl.'s Rep. Br. at 5), but the ALJ accepted that plaintiff could not remain on her feet most of the day, limiting her to a reduced range of sedentary work. Any error in not specifically discussing the cited records was harmless. See Stepp, 795 F.3d at 719 (reaffirming that harmless error applies to social security cases); see also Diaz v. Chater, 55 F.3d 300, 308 (7th Cir. 1995) ("[A]n ALJ need not provide a complete written evaluation of every piece of testimony and evidence[.]").

Plaintiff next argues that any benefit she received from treatment was short-lived, and that an ALJ cannot rely on temporary periods of improvement to support a conclusion that the claimant is capable of full-time work. (Pl.'s Br. at 16, Pl.'s Rep. Br. at 5-6, citing Scott v. Astrue, 647 F.3d 734, 739-40 (7th Cir. 2011) ("There can be a great distance between a patient who responds to treatment and one who is able to enter the workforce[.]".) The ALJ acknowledged that plaintiff "reported only temporary relief" from the pain management procedures plaintiff cites. (Tr. at 21.) However, he reasonably noted that she also reported "some benefit" from the physical therapy prescribed for her fibromyalgia; he further noted she obtained a good result from hip surgery, reporting that her hip was "feeling fine" after she completed therapy for that condition. (Tr. at 23.) Moreover, the ALJ did not equate the improvements noted in the records with the ability to work full-time; rather, he cited this evidence as contrary to plaintiff's statements regarding the severity of her symptoms and limitations.

Plaintiff further contends that the ALJ faulted her for sporadic treatment but failed to acknowledge that she stopped seeing her therapist because she could no longer afford it. (Pl.'s Br. at 17.) However, the records she cites in support, which indicate "I don't think I can

afford coming here anymore" (Tr. at 848) and "She is taking a break due to financial expenses" (Tr. at 993), are dated February 8, 2017, and July 18, 2017, respectively. The ALJ wrote that plaintiff's mental health treatment "was only sporadic, with essentially all her counseling sessions taking place outside the relevant period." (Tr. at 23, citing Tr. at 945-93.) Thus, while SSR 16-3p tells ALJs to consider possible reasons why the claimant did not seek treatment, which may include inability to afford it, 2016 SSR LEXIS 4, at *23-24, the evidence upon which plaintiff relies post-dates the relevant period by more than a year, making any error in failing to consider it harmless.

Plaintiff also faults the ALJ for relying on normal mental status exams while ignoring notations that she appeared depressed, anxious, or tearful, with flat affect. (Pl.'s Br. at 17.) As the Seventh Circuit has repeatedly stated, an ALJ need not provide a complete written evaluation of every piece of testimony and evidence. E.g., Shideler, 688 F.3d at 310. In any event, the ALJ acknowledged that plaintiff "exhibited a depressed mood with flat affect during examinations." (Tr. at 22.) Plaintiff also reiterates her argument that mental status exams in a therapeutic setting say little about how a person will perform in the workplace. (Pl.'s Br. at 17.) As indicated above, plaintiff fails to show that the ALJ was precluded from relying on the exam findings on this basis.

Plaintiff next argues that the ALJ relied on her daily activities without acknowledging her limitations in performing them. (Pl.'s Br. at 17, 18, citing Moss v. Astrue, 555 F.3d 556, 562 (7th Cir. 2009) ("An ALJ cannot disregard a claimant's limitations in performing household activities."), Pl.'s Rep. Br. at 6.) For instance, the ALJ relied on her Ebay "work schedule," but that schedule suggested she worked just four hours per day, which plaintiff contends is hardly indicative of the ability to perform full-time work. (Pl.'s Br. at 17-18, citing Tr. at 988.) The ALJ

did not equate this schedule with full-time work but rather cited it as evidence that plaintiff "retained a greater mental capacity" than she claimed.  (Tr. at 23.)  "[T]here is a critical difference between an ALJ improperly saying, the claimant can perform this range of activities, therefore [she] can work, see Roddy v. Astrue, 705 F.3d 631, 639 (7th Cir. 2013), and an ALJ reasonably saying that the claimant can perform this range of activities, therefore [she] can do more than [she] claims, see Pepper v. Colvin, 712 F.3d 351, 369 (7th Cir. 2013)."  Fifield v. Berryhill, No. 17-C-81, 2017 U.S. Dist. LEXIS 188816, at *53 (E.D. Wis. Nov. 15, 2017); see also Berger, 516 F.3d at 546 ("Although the diminished number of hours per week indicated that Berger was not at his best, the fact that he could perform some work cuts against his claim that he was totally disabled.").

The ALJ also cited an April 2016 note stating that plaintiff and her husband eat out a lot and shop at Goodwill as inconsistent with her claim that she rarely leaves her home (Tr. at 19, 23, 991), yet plaintiff notes that she testified she rarely leaves home alone, usually accompanied by her husband or parents (Pl.'s Br. at 18, citing Tr. at 54-55).  The ALJ further relied on her attendance at baseball games, yet she reported going just once or twice per month and did not stay for the whole game.  (Pl.'s Br. at 18, citing Tr. at 210.)  However, the ALJ cited this (and other) evidence as contrary to plaintiff's claim that she "was unable to interact with people in public."  (Tr. at 23.)

In any event, even if the ALJ should have considered plaintiff's daily activities with greater caution, any error was harmless.  See Halsell v. Astrue, 357 Fed. Appx. 717, 722-23 (7th Cir. 2009) ("Not all of the ALJ's reasons must be valid as long as enough of them are, see, e.g. Simila v. Astrue, 573 F.3d 503, 517 (7th Cir. 2009); Shramek v. Apfel, 226 F.3d 809, 811 (7th Cir. 2000), and here the ALJ cited other sound reasons for disbelieving Halsell.").  Plaintiff

36

does not in her main brief dispute the ALJ's reliance on her inconsistent statements to providers, made during the relevant period, that she could do most of her recreational activities, did not normally change the way she managed her personal care, and could travel and concentrate with no difficulty. (Tr. at 23, citing Tr. at 500-02, 507-08.) These were valid reasons for discounting her testimony. See Richards v. Berryhill, 743 Fed. Appx. 26, 29 (7th Cir. 2018) (noting that while the ALJ's consideration of the claimant's activities was "shaky," he sufficiently supported the credibility determination with other specific reasons, including "meaningful discrepancies between her testimony and the statements she made to her doctors"); Elder, 529 F.3d at 414 ("The ALJ clearly provided a reason for his adverse credibility determination: he stated that Elder's testimony regarding the severity of her fibromyalgia and depression contradicted what she told Dr. Ko.").[14]

Finally, it is important to note that the ALJ partially credited plaintiff's testimony, finding her more limited than the agency consultants believed. The ALJ adopted an RFC for a reduced range of sedentary work, a "very serious" limitation, see SSR 96-9p, 1996 SSR LEXIS 6, at *1, particularly for a person 27 years old as of the alleged onset date. The ALJ also gave some weight to plaintiff's claims of problems dealing with others, limiting her to jobs involving only occasional interaction with co-workers and no interaction with the general public.

## C.    RFC

Finally, plaintiff complains that the ALJ's RFC omits important limitations. (Pl.'s Br at 19,

---

[14]In reply, plaintiff argues that the ALJ misconstrued the pain questionnaires; she cites notations of continued pain in those records and argues that her improvement did not last. (Pl.'s Rep. Br. at 6-7.) Arguments raised for the first time in reply are waived. Wigod v. Wells Fargo Bank, N.A., 673 F.3d 547, 571 (7th Cir. 2012). In any event, plaintiff does not dispute the contents of the records cited by the ALJ, which show that for a significant period during the relevant time she admitted being functional, contrary to her later claims.

Pl.'s Rep. Br. at 7.) RFC is an assessment of the claimant's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis, i.e., eight hours a day for five days a week or an equivalent work schedule. SSR 96-8p, 1996 SSR LEXIS 5, at *1. The RFC assessment must be based on all of the relevant evidence in the record, including the treatment notes, medical source statements, reports of daily activities, and lay evidence. Id. at *13-14. The assessment must also include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts and non-medical evidence. Id. at *19. Finally, the RFC must include all limitations supported by record evidence. See Jozefyk v. Berryhill, 923 F.3d 492, 497 (7th Cir. 2019); see also Outlaw v. Astrue, 412 Fed. Appx. 894, 898 (7th Cir. 2011) ("The ALJ needed only to include limitations in his RFC determination that were supported by the medical evidence and that the ALJ found to be credible.").

As indicated above, in the present case, the ALJ limited plaintiff to unskilled, sedentary work, with a sit/stand option, occasional postural movements, occasional changes in the work setting and interaction with co-workers and supervisors, and no interaction with the public. (Tr. at 20.) Plaintiff contends that the ALJ should have included additional limitations related to her variable functioning and limited use of the upper extremities, either one of which would have precluded work. (Pl.'s Br. at 19-20.)

Plaintiff first argues that the ALJ failed to account for her testimony and other reports of good and bad days (Pl.'s Br. at 20), contrary to the requirement that the RFC assess the ability to do work on a regular and continuing basis (Pl.'s Br. at 21). However, the ALJ acknowledged plaintiff's statements regarding bad days (Tr. at 20-21), contrasting those claims with the objective medical evidence, her inconsistent reports to providers, and her activities (Tr. at 23-

24).  He also relied on the reports of the agency consultants, who concluded that plaintiff could sustain full-time work.  (Tr. at 24.)

Second, plaintiff complains that the RFC includes no upper extremity limitations.  (Pl.'s Br. at 21.)  The ALJ considered and rejected Dr. Hadcock's opinion concerning occasional handling and fingering, which found no support in the records.  (Tr. at 24.)  The ALJ also considered plaintiff's claims of numbness and weakness of her upper and lower extremities, contrasting those claims with exam findings of full motor strength and function in all her extremities, intact sensation, normal deep tendon reflexes, and a generally normal gait.  (Tr. at 22.)  Plaintiff acknowledges these findings but contends that her experience of pain is exacerbated by her mental health (Pl.'s Br. at 21), and that the normal physical examinations do not logically lead to the conclusion that she has no upper extremity limitation (Pl.'s Br. at 22). It was plaintiff's burden to prove that she was disabled, not the ALJ's, see Summers, 864 F.3d at 527, and she points to no specific evidence, overlooked by the ALJ, supporting additional upper extremity limitations.  Nor does she explain why the ALJ was required to find upper extremity limitations based on her mental health/somatic complaints.

## IV.  CONCLUSION

**THEREFORE, IT IS ORDERED** that the ALJ's decision is affirmed, and this case is dismissed.  The Clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 26th day of March, 2020.

s/ Lynn Adelman
LYNN ADELMAN
District Judge